



IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA : CRIMINAL ACTION
v. : NO. 09-513
EMANUEL E. PATTERSON a/k/a "MANNY" :

FILED
OCT 19 2009
MICHAEL E. KUNZ, Clerk
By______Dep. Clerk

**SURRICK, J.** **OCTOBER 16, 2009**

**MEMORANDUM**

Presently before the Court is Defendant's Motion to Suppress Involuntary Statements Induced by Promises of Leniency. (Doc. No. 21.) For the following reasons, Defendant's Motion will be denied.

## I. BACKGROUND

On July 30, 2009, a federal grand jury indicted Defendant Emanuel E. Patterson for his alleged involvement in the December 19, 2008, robbery of the Sovereign Bank located at 125 South Providence Road in Media, Pennsylvania. The indictment charges Defendant with one count of conspiracy to commit bank robbery in violation of 18 U.S.C. § 371, one count of armed bank robbery in violation of 18 U.S.C. § 2113(d), and one count of carrying and using a firearm during a crime of violence in violation of 18 U.S.C. § 924(c)(1). The Government alleges that Defendant and two co-conspirators, Michael Hawkins (a/k/a "Tute") and Rahsaan Lahvon Ford (a/k/a "Saan," a/k/a "Saani," a/k/a "White Bread"), agreed to rob the Sovereign Bank. Defendant was to be the getaway driver.

On the morning of the robbery, Defendant drove Hawkins and Ford to Media. As he was driving, Defendant's car was pulled over by police. The police seized the car because Defendant

did not have a license. Hawkins and Ford decided to continue with their plan to rob the bank. At about 10:00 a.m., Hawkins and Ford entered the Sovereign Bank. Hawkins produced a semiautomatic pistol, pointed it at bank employees and customers, and ordered everyone to get on the floor. In the meantime, Ford went behind the counter and put approximately $78,142 in cash into a plastic bag. When Ford finished filling the bag, he and Hawkins exited the bank with the cash. They decided to use public transportation to escape. There was a trolley stop near the bank and Hawkins and Ford boarded a trolley. They were apprehended by the police, who waited for them at a trolley stop and arrested them.

Defendant did not enter the bank during the robbery. He was on the trolley that Hawkins and Ford boarded in their attempted escape from the scene, and he was on the trolley when the police arrested Hawkins and Ford. Defendant was not arrested and apparently had no contact with the police at that time. After questioning by FBI agents, Hawkins and Ford indicated that Defendant was their accomplice. Ultimately, Defendant was interviewed by FBI agents and he signed a statement admitting his participation in the robbery. Defendant now moves to suppress the statement.

On October 9, 2009, a hearing was held to address Defendant's Motion to Suppress. Special Agent Vito Roselli, one of the agents who interviewed Defendant, testified as did Defendant and his wife, Kia Patterson. We make the following findings of fact based on the testimony and exhibits offered at the hearing.

## II. FINDINGS OF FACT

FBI Special Agent Roselli is assigned to a Violent Crimes Task Force in Philadelphia, Pennsylvania. (Oct. 9 Hr'g Tr. 10.) He was involved in the investigation of the December 19,

2008, Sovereign Bank robbery. (*Id.*) During the course of his investigation, Special Agent Roselli came to believe that Defendant was involved in the robbery. (*Id.* at 11.) In order to substantiate his belief, he and his partner, Task Force Officer John Benham, visited Defendant's home on January 20, 2009. (*Id.*) Defendant was not home, but Defendant's wife, Kia Patterson, was. (*Id.*) The agents explained to Kia Patterson who they were and why they were at her home. (*Id.*) Kia Patterson invited the agents in and they questioned her about Defendant's whereabouts, among other things. (*Id.* at 12.) She informed the agents that Defendant might be in one of the Carolinas visiting a friend. (*Id.*) Special Agent Roselli provided Kia Patterson with his cell phone number and requested that she ask Defendant to call him. (*Id.*) The interview was voluntary and not confrontational. (*See id.* at 12, 48.) Special Agent Roselli described Kia Patterson as "very pleasant [and] very courteous" and the interview in general as "a pretty nice meeting." (*Id.* at 12.)

Defendant called Special Agent Roselli the day following the agents' visit to Defendant's home. (*Id.* at 13.) Defendant indicated that his wife had informed him that the agents wanted to meet with him to discuss the robbery of the Sovereign Bank. (*Id.*) He further indicated that he was willing to meet with the agents. (*Id.*) During the conversation Defendant was courteous and receptive. (*See id.*) After Defendant listened to what Special Agent Roselli had to say, which was "we need to get together and talk about this," the call ended. The next day, January 22, 2009, Defendant and Special Agent Roselli spoke again on the phone. (*Id.* at 13-14.) It is unclear who initiated the call, but Defendant requested that he and the agents meet somewhere other than his home because he was concerned that people in his neighborhood would see the agents coming to his house. (*Id.* at 14.) Defendant suggested that the agents come by his house

and that they go somewhere else to talk. (*Id.* at 14, 72.)

Special Agent Roselli and another partner, Agent John Hess, drove to Defendant's neighborhood and parked a few houses away from Defendant's house. (*Id.* at 14.) When Special Agent Roselli called Defendant to inform him that he and his partner were in the neighborhood, Defendant had evidently changed his mind about the agents interviewing him in his home because he instructed the agents to go there. (*Id.*) Defendant invited the agents into his house. (*Id.*) Kia Patterson was present. (*Id.*) Defendant and his wife escorted the agents into the living room where the four of them sat at the living room table. (*Id.* at 15.) Once everyone was seated, Special Agent Roselli introduced himself and his partner, explained that they were there to discuss the robbery of the Sovereign Bank, and told Defendant that he was not being arrested and that he was not in custody. (*Id.* at 16.) Special Agent Roselli requested that Defendant permit him to explain the situation after which he would ask Defendant questions. (*Id.* at 17.) He did not read Defendant his *Miranda* rights. (*Id.*)

Special Agent Roselli informed Defendant of the types of charges he might face and the sentencing considerations that accompany charges of the use of a firearm during a crime of violence, specifically the potential, if Defendant were convicted, of a seven-year mandatory minimum sentence that would run consecutively to any sentence accompanying conviction on other charges. (*Id.* at 16-17.) After informing Defendant of the charges he was facing, Special Agent Roselli explained to Defendant the incentives to cooperate with the FBI. (*Id.* at 17.) In this regard, Special Agent Roselli informed Defendant that if he cooperated and if his cooperation were "worthy," the Government would file a motion seeking a downward departure when Defendant was sentenced, which would allow the judge to depart downward from the

mandatory minimum that accompanied the charge for use or carrying a firearm during and in relation to a crime of violence. (*See id.*) Special Agent Roselli further informed Defendant that whichever judge sentenced him would retain ultimate authority to decide Defendant's sentence. (*Id.*) In response to this, Defendant indicated his understanding of cooperation by asking whether he could "get screwed" if he cooperated. (*See id.* at 18.) Special Agent Roselli made it clear that such an outcome was "absolutely" possible. (*See id.*) Neither Special Agent Roselli nor his partner promised Defendant that his cooperation would result in a lighter sentence or fewer or different charges being brought against him. (*See id.*) At the end of the discussion, Defendant expressed concern that he might not have valuable information to offer and that cooperating might put him and his family in danger. (*Id.* at 19.)

After about an hour of discussing cooperation generally, Special Agent Roselli began to interview Defendant about the events of December 19, 2008. (*See id.* at 20.) Defendant initially denied involvement in the robbery. (*Id.* at 21.) Special Agent Roselli told Defendant that he did not believe Defendant's story, that "it was not smart to lie at this point," and reminded the Defendant that he had to be honest to receive "cooperation consideration." (*Id.* at 21-22 ) In response to Special Agent Roselli's statements, Defendant admitted that he had gone to Media with Hawkins and Ford to rob the Sovereign Bank. (*Id.* at 21.) Once Defendant admitted that he was involved in the robbery, Special Agent Roselli began to question him about the events of December 19, 2008. Defendant told Special Agent Roselli that Defendant was "only" supposed to be the getaway driver and that he had intended to stage himself at a nursing home in close proximity to the Sovereign Bank. (*Id.* at 23.) He went on to recount to Agent Roselli the events of the robbery. Although Defendant did not know all the details of the plan to rob the bank, he

assumed that a gun would be used. (*Id.*) On the day of the robbery, Defendant used his wife's minivan to drive Hawkins and Ford to Media. (*See id.*) While they were in transit, the police pulled the minivan over. (*Id.*) As this was happening, Defendant observed Ford throw a gun into the back seat of the minivan. (*Id.*) The police seized the minivan because Defendant did not have a license. (*Id.*) Defendant wanted to call off the robbery after the police seized his wife's minivan, but Hawkins and Ford wanted to proceed with the plan. (*Id.*) The three ultimately decided to conduct the robbery. Defendant waited outside the bank while Hawkins and Ford robbed it, and he got on a trolley at the stop in front of the bank at some point during or after the robbery. (*Id.* at 24.) Hawkins and Ford got onto that same trolley one stop later and were arrested shortly thereafter. (*Id.*) Defendant was not arrested. (*Id.*)

After Defendant explained the events surrounding the robbery, he provided the agents with a written statement. (Doc. No. 25, Ex. A; Oct. 9 Hr'g Tr. 25.) The statement is hand-written on a single sheet of paper and consists of three paragraphs. (*See* Doc. No. 25, Ex. A.) The first paragraph, which includes a date and time of January 22, 2009, 4:50 p.m., in the upper right-hand corner, states: "On Dec 19 myself, Whiteboy [Ford], and Tute [Hawkins] all were riding up Baltimore Pike. We were stopped at Providence + Baltimore Pike. Where the car was taken due to me (Emanuel Patterson) not have a license. After that I returned home."[1] (*Id.*) Defendant wrote his initials at the end of the paragraph. (*Id.*) When Special Agent Rosselli read Defendant's statement, he informed Defendant that the purpose of the statement was for Defendant to explain his involvement in the bank robbery and that he would need to provide

[1] We reproduce Defendant's statement as he wrote it. All spelling and grammar errors are reproduced from the original.

more details. (Oct. 9 Hr'g Tr. at 26.) Defendant wrote three additional paragraphs:

> The reason we went out to Media was to do a Robbery. Previously I was with Tute [Hawkins] and Whiteboy [Ford] when they talk about Robbing a bank. On this morning, they told me that it would be a Soverrign Bank. I was only [two illegible crossed out words with Defendant's initials above] supposed to be the get a way driver. When my car was taken I just wanted to go home. E.P. And I did go home. E.P.
>
> I provided this voluntarily.
>
> The above is true and accurate to the best of my recollection.

(Doc. No. 25, Ex. A.) Defendant signed his name at the end of the final sentence, dated it January 22, 2009, and wrote the time, 5:05 p.m. (*Id.*) Special Agent Roselli and Agent Hess signed and dated the page below where Defendant had signed. (*Id.*) Special Agent Roselli then asked Defendant to provide some information regarding the gun. (Oct. 9 Hr'g Tr. at 26-27.) Below the agents' signatures there is a final paragraph that is connected to the preceding text by a hand-drawn line. (Doc. No. 25, Ex. A.) That paragraph states: "The first time I saw the gun is when the police first pulled us over. White boy [Ford] threw it and Tute [Hawkins] must have picked it up." Defendant's initials appear next to the paragraph, and below the paragraph Defendant signed his name, dated it January 22, 2009, and wrote the time, 5:15 p.m. (*Id.*) The agents signed their names below Defendant's name. (*Id.*) The meeting concluded shortly after Defendant made the final alteration to his statement. (Oct. 9 Hr'g Tr. at 27.)

Special Agent Roselli was a credible witness. His demeanor on the stand was straightforward and clam, and his testimony was clear and consistent. In addition, his testimony was corroborated in significant ways by other evidence in the record. For instance, he characterized his interactions with Defendant and his wife as "polite," a characterization with which Kia Patterson agreed. Accordingly, we find that his testimony accurately reflected the

nature and circumstances under which Defendant provided his written statement. In particular, we find credible Special Agent Roselli's testimony that he did not make any promises or guarantees to Defendant about leniency or what charge would be brought against Defendant. (*See id.* at 17-18, 24-25.) The testimony to the contrary offered by Kia Patterson and Defendant, both of whom testified at the hearing, was not credible in this regard. (*See id.* at 44-47, 58, 63-64, 73-74.) For instance, Kia Patterson's testimony regarding the FBI agents' purported promise that Defendant would not be charged with the gun if he cooperated seemed forced and sounded as if recited by rote. (*See id.* at 45.) She provided no details about the promise or the context in which it was given. Defendant's testimony regarding the promises was likewise vague, and when discussing the promises his demeanor was evasive. Defendant testified that, after he wrote the first paragraph of his statement, Special Agent Roselli admonished him by saying, "[S]top bullshitting me, you['re] bullshitting me, you're playing games. You want to play games? I can stick it to you." (*Id.* at 63.) We find this characterization to be not credible because, among other reasons, it contradicts Kia Patterson's testimony that the meeting was polite. Moreover, Kia Patterson did not corroborate Defendant's story, and Defendant did not indicate that she was not present for it. When compared with Special Agent Roselli's account of the events that led Defendant to flesh out his statement, Defendant's testimony lacks the ring of truth.

We find that Kia Patterson's and Defendant's testimony that the agents made promises to Defendant not to be credible for an additional reason: Defendant testified at the hearing that the contents of the statement were substantially true.[2] Defendant testified as follows:

---

[2] Defendant chose to testify at the hearing after the Court confirmed with Defendant's counsel that he had discussed the implications of testifying with his client and after Defendant's counsel took a break and "re-explained . . . [Defendant's] constitutional rights . . ." to him. (*Id.*

Q: [Y]ou did know about the robbery at the time that you were in the car with Saani [Ford] and Tute [Hawkins] that moring?
A: Yes.
Q: And you were aware that . . . the plan was to rob the Sovereign Bank over in Media?
A: I did not find out it was the Sovereign Bank until that morning when we got up there.
Q: Okay. So you stated to Agent Roselli that you knew about the robbery that morning, and that you, Saani [Ford] and Tute [Hawkins] discussed doing a robbery together. Is that right?
A: Correct.
Q: And that was the truth, right?
A: Correct.
Q: And you also stated that your role was to be the getaway driver, is that right?
A: Correct.
Q: And that's the truth also, right?
A: Correct.

(*Id.* at 76-77.) Defendant testified that he did not know, prior to December 19, 2008, that a gun was going to be used in the robbery. (*Id.* at 78.) He further testified that his statement was inaccurate when it stated that he had seen a gun. (*Id.* at 80.) He testified that he should have written that he assumed it was a gun. (*Id.* at 78-80.) Defendant did not contend that his statement was inaccurate because of anything that the agents did or said to him; rather, he appeared to attribute the inaccuracy to a mistake on his part: "I should have put, [']I assumed it was a gun,['] . . . because I never actually physically seen the gun." (*Id.* at 80.) However, Defendant made clear that he had assumed at some point before Hawkins and Ford robbed the bank that one of them had a gun. (*See id.* at 79.) Defendant also testified that he was within view of the bank at the time of the robbery, that he got onto the trolley, that he saw Hawkins and Ford get on the same trolley, and that he saw them get arrested shortly after getting on the trolley. (*Id.* at 81-82.)

---

at 60-61.) Defendant's counsel indicated to the Court that "Mr. Patterson has stated that he understands his rights . . . and he would like to take the stand with regard to the motion." (*Id.* at 61.)

We find that Defendant's willingness to testify to the accuracy of his statement in open court constitutes persuasive evidence that he was not coerced or motivated by promises of leniency when writing his original statement.

## III. DISCUSSION

Defendant seeks to have the statements he gave to Special Agent Roselli and Agent Hess on January 22, 2009, suppressed because "they were involuntary and were induced by law enforcement's direct and implied promises of leniency." (Doc. No. 21 at 1.) The Government responds by arguing that, "in view of the totality of the circumstances of the interview, there can be no doubt that [Defendant's] statements were made voluntarily and of his own free will." (Doc. No. 25 at 11.)

"Statements made to a law enforcement officer are inadmissable into evidence if the statements are 'involuntary.'" *United States v. Jacobs*, 431 F.3d 99, 108 (3d Cir. 2005) (citations and footnote omitted). Courts must consider the totality of the circumstances when determining the voluntariness of statements made to law enforcement officer. *Id.* The inquiry should examine whether the statement is "the product of an essentially free and unconstrained choice by its maker." *Id.* "If an individual's will is overborne or that person's capacity for self-determination is critically impaired, her or his statements are involuntary." *Id.* The United States Supreme Court has directed lower courts to consider several factors when determining the voluntariness of a statement, including the "youth of the accused, his lack of education, or his low intelligence, the lack of any advice to the accused of his constitutional rights, the length of detention, the repeated and prolonged nature of the questioning, and the use of physical punishment such as deprivation of food or sleep." *Schneckloth v. Bustamonte*, 412 U.S. 218,

225-26 (1973); *Miller v. Fenton*, 796 F.2d 598, 604 (3d Cir. 1986). In addition, a promise by a law enforcement officer may qualify as coercion when a law enforcement officer's "statements were so manipulative or coercive that they deprived [the defendant] of his ability to make an unconstrained, autonomous decision to confess." *United States v. Walton*, 10 F.3d 1024, 1029-30 (3d Cir. 1993) (citing *Miller*, 796 F.2d at 605); *see also United States v. McNaughton*, 848 F. Supp. 1195, 1200 (E.D. Pa. 1994) ("[A] statement by an agent that cooperation will be brought to the attention of prosecuting authorities does not automatically render a confession involuntary . . . .").

It is difficult to see how Defendant's statement can be viewed as involuntary or a product of coercion. Several factors lead us to conclude that Defendant's statement was completely voluntary. Those factors include the events leading up to the interview, the interview itself, and Defendant's testimony with regard to the events of December 19, 2008. On January 20, 2009, the FBI agents informed Kia Patterson that they were looking for Defendant in connection with the robbery. (Oct. 9 Hr'g Tr. at 27.) At this point, they had not established contact with Defendant. Thus, Defendant knew that the FBI was looking for him and knew why the FBI was looking for him before he met with the agents in person. There is no indication that the FBI told Kia Patterson that time was of the essence or that if Defendant did not contact them within a set amount of time, he would be arrested. Accordingly, Defendant, who has acknowledged his complicity in the robbery on the record, had ample time to prepare for the interview. Moreover, knowing that he was involved in the robbery, he could have sought legal representation, or he could have chosen not to speak to the FBI at all. He did neither. Instead, he elected, of his own accord, to contact the FBI the day after the agents spoke with his wife. (*See id.* at 13.) Defendant

and Special Agent Roselli spoke at least one more time before the in-person interview, giving Defendant at least one more opportunity to rethink his decision to meet with the FBI. Moreover, out of respect for Defendant's concerns about threats to his safety that might arise from the meeting, Special Agent Roselli permitted Defendant to choose where the meeting would take place.

Defendant's decision to meet with the FBI agents at his home bespeaks a fair level of control over the meeting. Having the meeting at his home provided Defendant a baseline of comfort not available to suspects who are in custody or who go to the station house to meet with law enforcement. *Cf. Beckwith v. United States*, 425 U.S. 341, 347 (1976) (holding that where Internal Revenue Service investigators interviewed the defendant at his dining room table, the investigators did not have to provide the defendant with *Miranda* warnings because the defendant "hardly found himself in the custodial situation described by the Miranda Court"). When the agents came to Defendant's home, they did not arrest him and they informed him that he was not in custody. (*See* Oct. 9 Hr'g Tr. at 16.) The interview took place at Defendant's living room table with his wife present. (*Id.* at 15.) His wife was comfortable enough with the interview to leave the table to answer the phone. (*Id.* at 58.) In fact, she described the FBI agents as "polite" and did not express any concern about how the agents comported themselves. (*Id.* at 59.) And while it has been recognized that "[e]xcessive friendliness on the part of an interrogator can be deceptive," *see Miller*, 796 F.2d at 607, there is no indication in the record that Defendant was ever under the impression that the agents were anything other than law enforcement officials gathering information that could potentially lead to Defendant's arrest. *See id.* (observing that "in some instances, in combination with other tactics, [excessive friendliness] might create an

atmosphere in which a suspect forgets that his questioner is in an adversarial role, and thereby prompt admissions that the suspect would ordinarily make only to a friend, not to the police"). We find no evidence of deception by the agents or that the interview was hostile or confrontational. We are satisfied that Defendant's statement was completely voluntary Defendant was not coerced or deceived into giving the statement. We note that Defendant is a person of average or above-average intelligence. He was 35 years old at the time of the interview and he has had prior experience with the criminal justice system. In that experience, he was subject to a custodial interrogation and was informed of his *Miranda* rights. (Doc. No. 25, Ex. C.) Thus, on January 22, 2009, Defendant was not totally unaware of his constitutional rights in connection with interacting with law enforcement. These factors further contribute to our determination that his statement voluntarily given to the FBI agents.

Defendant relies on two arguments to support his position that his statement should be suppressed. First he argues that his statement was obtained as a result of a false promise. (*See* Doc. No. 21 at 5.) This argument fails because we have found that the FBI agents made no promises to Defendant during the January 22, 2009, meeting. The FBI agents did not promise Defendant that he would not be charged in connection with carrying and using a firearm during a crime of violence in violation and they did not guarantee that his cooperation would automatically result in leniency. Moreover, even if one were to conclude that such promises were made, when viewed in the totality of the circumstances surrounding the interview, any such promises would not render Defendant's statement involuntary because those promises did not cause Defendant to confess. *See Walton*, 10 F.3d at 1029 (holding that "the real issue is not whether a promise was made, but whether there was a causal connection between [the] assurance and [the] statement" (citing *United States v Fraction*,

795 F.2d 12, 15 (3d Cir. 1986)). That is, the promises were not "so manipulative or coercive that they deprived [Defendant] of his ability to make an unconstrained, autonomous decision to confess." *See id.* at 1030. Indeed, Defendant offered no testimony that would support such a conclusion. To the contrary, during Defendant's testimony at the hearing he admitted his participation in this robbery and clearly no promises had been made prior to his taking the witness stand.

Finally, in his Motion and at the hearing, Defendant argued that the FBI agents were remiss in failing to inform Defendant of his *Miranda* rights, in particular his right to remain silent. (*See* Doc. No. 21 at 3; Oct. 9 Hr'g Tr. at 39-40, 65.) Defendant argues that this should be considered a factor when viewing the totality of the circumstances surrounding his statement. (Oct. 9 Hr'g Tr. at 89.) Defendant directed out attention to no case law that stands for this proposition. We note that *Miranda* warnings are required only when a suspect is both in custody and subject to interrogation. *Alston v. Redman*, 34 F.3d 1237, 1246-47 (3d Cir. 1994) (citing *Rhode Island v. Innis*, 446 U.S. 291, 300 (1980)). Defendant was clearly not in custody during the interview, and the FBI agents explicitly informed him of that fact. Accordingly, he was not entitled to a *Miranda* warning and we will not consider the fact that he was not given them as grounds for determining that his statement should be suppressed. *See, e.g.*, *Beckwith*, 425 U.S. at 347.

## IV. CONCLUSION

For the Foregoing reasons, Defendant's Motion is denied.

An appropriate order will follow.

BY THE COURT:

R. Barclay Surrick, J.